UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
SHARON Y. WILLIAMS,                                    :
                                                       :
                              Plaintiff,               :
                                                       :                **OPINION AND ORDER**
              -against-                                 :                11-CV-5583 (DLI)
                                                       :
MICHAEL J. ASTRUE,                                     :
Commissioner of Social Security,                       :
                                                       :
                              Defendant.               :
--------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Sharon Y. Williams filed an application for disability insurance benefits ("DIB")
under the Social Security Act (the "Act") on October 1, 1997, alleging a disability that began on
April 7, 1995. Plaintiff received a partially favorable decision from the Commissioner, awarding
benefits from April 7, 1995 through May 31, 1997, but denying benefits thereafter. Plaintiff
filed the instant appeal seeking judicial review of the denial of benefits, pursuant to 42 U.S.C. §
405(g). The Commissioner now moves for judgment on the pleadings, pursuant to Fed. R. Civ.
P. 12(c), seeking affirmance of the denial of benefits. (*See* Memorandum of Law in Support of
Government's Motion ("Gov't Mem."), Dkt. Entry No. 19.) Plaintiff cross-moves for judgment
on the pleadings, requesting that this Court vacate the Commissioner's decision and remand for
further administrative proceedings. (*See* Memorandum of Law in Support of Plaintiff's Motion
("Pl. Mem."), Dkt. Entry No. 21.)

For the reasons set forth more fully below, the Commissioner's motion is granted, and
Plaintiff's motion is denied. The instant action is dismissed with prejudice.

# BACKGROUND

## A.    Administrative and Procedural History

On October 1, 1997, Plaintiff filed an application for DIB, which was denied on initial review and reconsideration.  (*See* Certified Administrative Record ("R."), Dkt. Entry Nos. 24-26, 66, 76, 85-87.)  On May 17, 2000, Plaintiff appeared with counsel and testified at a hearing before an Administrative Law Judge ("ALJ").  (R. 25-65.)  On July 28, 2000, the ALJ issued a decision finding that Plaintiff was not disabled and denying her request for benefits.  (R. 8-17B.)  On December 6, 2002, the Appeals Council denied Plaintiff's request for review.  (R. 3-5.)  Subsequently, Plaintiff commenced a civil action in this Court seeking to vacate the Commissioner's decision and to remand the action for administrative proceedings.  *See generally Williams v. Barnhart*, 03-CV-0581(NG).  The parties stipulated to remand for further proceedings.  (R. 414-16.)

On April 27, 2004, the ALJ conducted a supplemental hearing.  (R. 383-413.)  On July 23, 2004, the ALJ issued a decision denying benefits (R. 417-28), which the Appeals Council vacated and remanded for further proceedings (R. 440-44).  On April 11, 2007, the ALJ conducted another hearing.  (R. 1780-1812.)  On May 22, 2007, the ALJ issued a decision denying benefits.  (R. 657-72.)  On December 3, 2008, the Appeals Council assumed jurisdiction and remanded the case to a new ALJ for further administrative proceedings.  (R. 685-88.)

On July 28, 2009, the new ALJ conducted a hearing.  (R. 1762-79.)  A vocation expert ("VE") and a state medical examiner testified.  (*Id*.)  Plaintiff attended with counsel but waived her right to testify.  (R. 1765.)  Instead, counsel asked the ALJ to rely on Plaintiff's testimony from the prior hearings.  (*Id*.)  On August 24, 2009, the ALJ issued a partially favorable decision. (R. 303-19.)  The ALJ found that she was disabled from April 7, 1995 (her alleged onset date), to

May 31, 1997, and not disabled on or after June 1, 1997.  (R. 315.)  In reaching this conclusion, the ALJ found that Plaintiff's medical condition improved by June 1, 1997, and that this improvement was related to her ability to work.  (R. 315-19.)  On July 23, 2011, this decision became the final decision of the Commissioner as the Appeals Council declined to assume jurisdiction.  (R. 285-88.)

Shortly thereafter, Plaintiff filed this action.  (*See* Complaint ("Compl."), Dkt. Entry No. 1.)  Based on Plaintiff's work history, she was last insured for DIB on December 31, 2001 (R. 1765), and must demonstrate that she was disabled before that date.  Thus, the focus of this action is whether the ALJ erred in concluding that Plaintiff was not disabled during the period June 1, 1997 to December 31, 2001.

## B.      Non-medical and Testimonial Evidence

Plaintiff was born in 1949 and is a high school graduate.  (R. 26.)  Previously, she worked as a motor vehicle operator, a data entry clerk, a credit investigator, an urban park ranger radio dispatcher, an office aide, and a special officer for a medical organization.  (R. 26, 31, 34, 101, 108-13, 120, 226, 693-94.)  The physical demands of her position as a data entry clerk included walking two hours, standing one hour, sitting six hours, occasionally bending, and lifting up to ten or twenty-five pounds.  (R. 112, 120.)  The physical demands of her position as a radio dispatcher included walking two hours, standing one hour, sitting six hours, occasional bending, and lifting up to ten pounds.  (R. 110.)

Plaintiff testified at her May 17, 2000 hearing that, on April 7, 1995, she was assaulted at work and has ceased working since then.  (R. 26-27, 33-34.)  She suffered injuries to her back and right knee.  (R. 32.)  She was taken to a hospital, but released later that day.  (R. 27, 1786-87.)  Plaintiff filed a claim through the New York State Workers' Compensation Board.  (R.

320.)  Her treatment for her injuries was paid for through this claim, until January 2000, when the Workers' Compensation Board declined to authorize further treatment.[1]  (R. 42-43.)

Plaintiff testified that she had not experienced any improvement to her condition since 1995, and that the May 30, 1996 surgery to her right knee did not help.  (R. 31, 38, 43-44.)  She testified that she continues to experience pain in her right knee, lower and upper back, right shoulder, and left heel.  (R. 32, 34-41, 44.)  She testified that she last treated with Dr. Conti[2] and her physical therapists for her right knee in January 2000.  (R. 32, 42-43.)  She ceased treatment for her right knee because she could not afford to pay for such treatment on her own.  (R. 28-29, 42-43.)  Plaintiff takes aspirin on a daily basis and no other medications for her injuries.  (R. 29.)  Plaintiff testified that she could use stairs with difficulty, sit for fifteen to twenty minutes before feeling lower back pain, and walk three blocks or stand twenty or thirty minutes before her knees begin swelling.  (R. 45-46.)  She admitted that she served as a juror for five days in August 1997 and did not request to be excused for medical necessity.  (R. 47-49.)  She stated that the sitting caused her pain and that she took medication during her service.  (R. 49.)

Plaintiff lives alone, in a single-family home, and spends most of her time "trying to sleep."  (R. 29-30.)  She reads, watches television, and listens to the radio.  (*Id*.)  She uses a cane, for balance, when she walks and does therapeutic exercise at home.  (R. 29-30.)  She is able to shower and dress herself.  (*Id*.)  She relies on friends and family to cook, clean, shop, and make her bed.  (*Id*.)  She owns a car, but has not driven it in three years.  (R. 31.)

---

[1]     It is unclear if this limitation is specifically with respect to orthopedic treatment for her knee, or for all medical specialties for all of her injuries.  After this date, she continued to treat with an internist on a regular basis, as well as weekly chiropractic care and physical therapy.

[2]     There are no records for treatment with Dr. Conti.  The ALJ attempted to obtain these records on his own, unsuccessfully.  (R. 1766.)  Neither Plaintiff nor her attorney was able to provide the ALJ with the doctor's full name or contact information.  (R. 1766-67.)

At her April 24, 2004 hearing, Plaintiff testified that she treated with Dr. Harold James, an internist, on a monthly basis since 2000. (R. 388-89.) Her knee had improved "a little" since her 1996 surgery. (R. 391.) She used a cane and had fallen in the past. (R. 391-92.) Her limitations remained the same as her prior testimony. (R. 390-92.) She testified that she drove her car one day per month for shopping. (R. 393.)

At her April 11, 2007 hearing, Plaintiff testified that her symptoms and restrictions remained unchanged. (R. 1785-88.) Plaintiff testified that she was depressed, that her doctors did not recommend treatment for it, and that she did not pursue treatment for it. (R. 1800-02.)

Plaintiff began to receive benefits through the Workers' Compensation Board on April 7, 1995. (R. 27, 88-91, 387-88, 1785-86.) On October 5, 1999, the Workers' Compensation Board issued a decision finding plaintiff permanently partially disabled. (R. 320.)

**B.     Medical Evidence**

**1.          Evidence of Treatment from April 7, 1995 to May 31, 1997**

On April 11, 1995, Plaintiff began treatment with Dr. Jacob M. Toledano, M.D., an orthopedic surgeon. (R. 135-36.) She stated that she had pain in her neck, sternum, right shoulder, lower back, and both knees. (R. 135.) The x-rays of her knees, sternum, and lumbosacral spine revealed no fracture or dislocation. (R. 136.) The x-rays of her cervical spine revealed a minimal subluxation of the C4 over C5, without any acute changes. (*Id.*) He diagnosed her with acute cervical and lumbar derangement, contusion of the knees with patellofemoral derangements, and contusions of the sternum and right shoulder (with rotator cuff tendonitis). (*Id.*) He opined that she was disabled, and ordered her to rest, begin physical therapy, and take the medication Lodine. (*Id.*) Plaintiff continued to treat with Dr. Toledano and his partner, Dr. Bruce L. Goldberg, M.D. through May 1996. (R. 185-94.) The doctors opined

that she was totally disabled during this period.  (*Id*.)  An MRI of her right knee revealed a grade I medial meniscal tear.  (R. 192.)

On May 30, 1996, Dr. Goldberg performed arthroscopic surgery for the internal derangement of her right knee.  (R. 137.)  Dr. Goldberg noted that "[t]he medial meniscus was noted to have a torn, or irregular free edge but quite insignificant and not enough to pay attention to with the use of basket forceps.  There was no detachment of the meniscus.  There was no tear that was significant."  (*Id*.)  Five days after the procedure, Plaintiff was able to partially bear weight and walk with crutches.  (R. 194.)  In August, she was "recuperating nicely," "making progress," and walking without a limp.  (R. 195-96.)  She stated that injections and physical therapy were relieving her pain and increasing her range of motion of the right knee.  (R. 196.)

On November 21, 1996, x-rays of Plaintiff's lumbar spine revealed scoliosis and mild degenerative disease of the facets.  (R. 199.)  Dr. Goldberg indicated that there was a "suggestion" of spondylolysis.  (*Id*.)  The x-rays showed that Plaintiff's right knee was "slightly porotic," but otherwise without fracture, dislocation or irregularities.  (*Id*.)

Plaintiff continued to treat regularly with Drs. Goldberg and Toledano.  (R. 130-34, 200-04.)  On May 5, 1997, Plaintiff complained about pain on a regular basis.  (R. 130.)  The x-rays of her right knee revealed some mild degenerative change of the medial joint space, but no other irregularities.  (*Id*.)  On May 27, 1997, Dr. Goldberg indicated that Plaintiff continued to suffer from "some mild subpatellar tenderness."  (R. 129.)  He stated that Plaintiff suffered from a permanent partial disability of her right knee.  (*Id*.)  He opined that she was "disabled from a work standpoint."  (*Id*.)

## 2.      Evidence of Treatment from June 1, 1997 to December 31, 2001

On June 20, 1997, Dr. Goldberg indicated that Plaintiff remained disabled from work.  (R. 129.)  He indicated that she would benefit from an MRI of the lumbar spine, and prescribed physical therapy.  (*Id*.)  On July 14, 1997, Plaintiff reported a recent fall due to a buckling of her right knee.  (R. 128.)  The x-rays of her right knee revealed no fracture or dislocation, but there was a distinct lateral tilt of the patella.  (*Id*.)  Dr. Toledano indicated that Plaintiff was disabled "for her usual and customary employment as a motor vehicle operator."  (*Id*.)  She continued treating with Dr. Goldberg.  (R. 127.)

On December 5, 1997, Kyung Seo, M.D. conducted a consultative examination of Plaintiff.  (R. 138-40.)  She complained of constant lower back and right knee pain, which is aggravated during standing, walking, and weight bearing.  (R. 138.)  Dr. Seo found normal range of motion of her cervical spine and upper extremities.  (*Id*.)  He found no muscular atrophy of the thigh or lower legs.  (*Id*.)  Both ankles and the left knee had normal range of motion.  (R. 139.)  He diagnosed her with internal derangement of the right knee and status-post arthroscopic surgery and meniscectomy.  (*Id*.)  He indicated that she is "able to sit approximately 1 hour without interruption, able to stand approximately 30 minutes, able to walk a couple of blocks and able to lift and carry approximately 15 lbs."  (*Id*.)

On December 15, 1997, a State agency medical consultant, Alan Kaye, M.D., reviewed Plaintiff's medical records and completed a physical residual functional capacity ("RFC") form.  (R. 141-48.)  He concluded that Plaintiff retained the RFC to lift, carry, and push/pull twenty pounds occasionally and ten pounds frequently.  (R. 142.)  He found that she could stand/walk at least two hours and sit approximately six hours in an eight-hour workday.  (*Id*.)  He found that

she could do unlimited pushing/pulling, and occasionally climb, balance, stoop, kneel, crouch, and crawl.  (R. 142-43.)

On January 13, 1998, Plaintiff began treating with Jeffrey Schwartz, M.D.  (R. 217-18.) She complained of residual pain and stiffness in the right knee and lower back.  (R. 217.)  He noted that she walked with a cane.  (*Id*.)  He diagnosed her with internal derangement of the lumbosacral spine, arthroscopy of the right knee with sequella, and a current "whole person deficit" of 18%.  (*Id*.)  He prescribed physical therapy three times per week for four weeks.  (R. 218.)  His conclusions and recommendations remained unchanged at Plaintiff's appointment on February 10, 1998.  (R. 215-16.)

On March 26, 1998, Dr. Schwartz completed a Disability Determination form.  (R. 149-55.)  He diagnosed her with lower back pain secondary to work trauma, and arthroscopy of the right knee.  (R. 149.)  He noted that, with the benefit of physical therapy, Plaintiff had reported less pain and increased range of motion.  (R. 150.)  He opined that Plaintiff could walk up to six hours per day, and sit up to eight hours per day.  (R. 151.)  She could lift and carry and push and pull up to 15 pounds.  (*Id*.)  She had no other limitations.  (*Id*.)  He concluded that she could work with some restrictions.  (R. 152.)

On May 5, 1998, Dr. Schwartz indicated that his findings and conclusions were unchanged from those contained in his February 10 evaluation.  (R. 213-14.)  He ordered an MRI of the lumbar spine to rule out disc pathology.  (R. 212.)  The MRI, which was conducted on July 31, 1998, was negative.  (R. 1447.)

On November 17, 1998, Plaintiff returned to Dr. Seo for a second orthopedic consultative examination.  (R. 156-59.)  She complained of stiffness and pain in her lower back and right knee.  (R. 156.)  She reported that she attended physical therapy and took Voltaren and Naprosyn

for pain relief. (*Id.*) She walked with a mild limp and explained that she used a cane for balance. (*Id.*) Plaintiff had no difficulty standing up from a seated position, and no problem getting on and off of the examination table. (*Id.*) Dr. Seo diagnosed Plaintiff with internal derangement of the right knee joint, status-post arthroscopic procedure, and chronic muscle strain of the paraspinal muscle on the low back. (R. 157.) He opined that due to the muscle spasm of the paraspinal muscles of the lower back, Plaintiff would have difficulty sitting, standing, bending, and lifting and carrying heavy objects. (*Id.*) He opined that she could sit and stand approximately thirty minutes without interruption, walk a few blocks, and lift and carry approximately 15 pounds. (*Id.*) On December 3, 1998, Dr. Seo provided a supplemental report, indicating that, medically, Plaintiff did not need a cane to walk as he found no instability of her knees. (R. 158.) He indicated that Plaintiff told him that she uses a cane to prevent future accidents. (*Id.*)

On December 14, 1998, a State agency medial consultant, C. Ladopoulous, M.D., reviewed Plaintiff's medical records and completed a physical RFC report. (R. 160-67.) Dr. Ladopoulous concluded that Plaintiff retained the RFC to lift, carry, and push/pull twenty pounds occasionally and ten pounds frequently. (R. 161.) He found that she could stand/walk at least six hours and sit approximately six hours in an eight-hour workday. (*Id.*) He indicated that he relied on Dr. Seo's findings in reaching this result. (R. 161-62, 166.) He reported that Plaintiff complained of right knee and lower back pain, as well as a buckling of both knees when she got out of bed. (R. 165.) He concluded that these complaints were inconsistent with the examination, as the examination found no instability of the knees and that a cane was not medically necessary. (*Id.*)

On February 24, 1999, Dr. Schwartz completed a musculoskeletal medical report and an RFC report. (R. 169-74.) He diagnosed Plaintiff with positive lumbar spasm and atrophy of the right knee. (R. 169.) He also indicated that she suffered from depression. (R. 170.) He opined that Plaintiff could lift and carry ten pounds occasionally. (R. 171.) She could stand and walk for a total of two hours (one hour without interruption) and sit for two hours total (one-half hour without interruption) in an eight-hour day. (R. 172.) She could occasionally climb, kneel, crouch, stoop, and balance, but could never crawl. (*Id.*) Additionally, she had environmental restrictions, including avoiding exposure to heights, fumes, and noise, because these "activities affect pain." (R. 173.)

On June 16, 1999, he completed another RFC report. (R. 176-81.) He diagnosed her with derangement of the right knee and lower back pain. (R. 176.) He noted that her depression was affecting her physical condition. (R. 177.) He stated that she could walk no further than one city block without needing rest. (R. 178.) During an eight-hour workday, she could sit for fifteen minutes at a time for four hours total, and could stand or walk for fifteen minutes at a time for two hours. (*Id.*) She would need to walk for five minutes, approximately every twenty minutes, and would need a job that permitted shifting of positions from standing, sitting, and walking. (R. 179.) She would need to take unscheduled breaks of five to ten minutes every hour. (*Id.*) She could lift and carry less than ten pounds frequently and ten pounds occasionally. (*Id.*) During an eight-hour workday, she could bend at the waist for 10% of the time and twist at the waist for 15% of the time. (R. 180.) She would likely be absent from work three times per month. (*Id.*) He stated that the earliest date to which the description of symptoms and limitations in her report applied was April 7, 1995 (R. 181), even though his earlier examinations indicated otherwise.

In January 2000, Plaintiff received treatment from Mary Immaculate Hospital for chemical dermatitis, which was reportedly caused by high chlorine levels in a hotel whirlpool. (R. 700-10.)

On August 9, 2000, Harold James, M.D., and internist, examined Plaintiff and evaluated her for physical therapy. (R. 245-48.) Plaintiff reported back, shoulder, knee, neck, and foot pain, and that she last attended physical therapy in January 2000. (R. 245.) He examined Plaintiff and concluded that she was permanently partially disabled. (R. 247.) He suggested further diagnostic testing and referred her to a neurologist, a chiropractor, a physical therapist, and an acupuncturist. (R. 248.) On August 10, 2000, Plaintiff began a course of chiropractic treatment and continued until October 26, 2000. (R. 491-95.)

On November 16, 2000, Dr. James completed an RFC report. (R. 259-64.) He diagnosed cervical and lumbar radiculopathy, right knee status-post torn cartilage, and left knee internal derangement. (R. 259.) He did not identify clinical findings or objective signs. (R. 260.) He stated that Plaintiff's depression and anxiety contributed to the severity of her symptoms and functional limitations. (*Id.*) He stated that Plaintiff could walk for two blocks. (R. 261.) During an eight-hour workday, she could sit for fifteen minutes at one time, for up to two hours, and stand for fifteen minutes at one time, for up to two hours. (R. 262.) She would need to take unscheduled breaks of five to ten minutes every half hour. (*Id.*) She could use her hands and fingers for 80% of the workday, but could not use her left arm for any reaching. (R. 263.) She could bend and twist at the waist for 50% of the day, and she would likely be absent from work three times per month. (*Id.*) He stated that these limitations began on April 7, 1995. (R. 264.)

Plaintiff received biweekly chiropractic care from November 30, 2000 through April 13, 2001. (R. 480-81, 483-89, 1029, 1032.) On April 27, 2001, Dr. James noted that Plaintiff was

"applying for total disability." (R. 249.) She treated with chiropractic care and physical therapy from May 17, 2001 through August 9, 2001. (R. 473-79, 482, 1018-20, 1023-26.)

On August 24, 2001, Plaintiff visited Dr. James and complained of continued pain. (R. 251.) She reported a "cracking" sound in both knees. (*Id*.) Dr. James indicated that her knees were diffusely tender with "crepitations." (*Id*.) Dr. James ordered x-rays of her knees and prescribed continued physical therapy and chiropractic care (*id*.), which Plaintiff attended from August 24, 2001 through October 18, 2001 (R. 468-72, 1011-15). His recommendations remained unchanged at Plaintiff's November 9, 2001 appointment. (R. 1009-10.) She received physical therapy and chiropractic care from November 16, 2001 through December 21, 2001. (R. 467, 541-42, 1005-06, 1008.) Plaintiff visited Dr. James in November and December 2001 for other illnesses. (R. 252-54, 1007.)

### 3. Evidence of Treatment after December 31, 2001

Plaintiff treated with her internist, Dr. James, eight times in 2002, complaining of intermittent left shoulder, back, and bilateral knee pain. (R. 255-58, 448-49, 574-77, 582-83, 585-88, 963-64, 974-77, 982-83, 985-88, 992-93, 999-1000, 1270-71.) She saw him four times in 2003, with similar complaints. (R. 499-500, 503-04, 517, 590, 596, 598, 933-34, 937-38, 951-52, 958-60.) She treated with him once during each of the following periods: March 2004 (R. 561-62, 921-22, 1250-51); September 2005 (R. 1544-45); February 2007 (R. 866-67, 1208-09); and April 2009 (R. 1450-51). There are no records of examinations in 2006 and 2008. Dr. James completed RFC reports on May 21, 2002 (R. 238-44), April 13, 2004 (R. 452-58), and April 6, 2007 (R. 1384-91.)

Plaintiff received bimonthly physical therapy from January 21, 2002 through April 16, 2009. (R. 451, 496-98, 501-02, 505-16, 543-60, 563-73, 578-81, 584, 589, 591-95, 597, 599-

600, 602-04, 864-65, 868-920, 923-32, 935-36, 939-50, 953-57, 959, 961-62, 965-73, 978-81, 984, 989-91, 994-98, 1001-02, 1206-07, 1210-49, 1252-59, 1261-69, 1452-1590.)  On May 22, 2002, her therapist completed a lumbar spine impairment questionnaire.  (R. 265-71.)

Plaintiff received bimonthly chiropractic care from January 18, 2002 through April 16, 2009.  (R. 450, 518-40, 608-56, 711-14, 717-834, 1053-56, 1059-1176, 1621-1758.)

On July 9, 2009, Dr. James prepared a letter ("To Whom it May Concern:"), summarizing Plaintiff's treatment with him from August 9, 2000 through the present.  (R. 1760-61.)  He diagnosed her with cervical and lumbar radiculitis, bilateral knee internal derangements, and shoulder sprain.  (R. 1760.)  He stated that she treated regularly, but unsuccessfully, with physical therapy and chiropractic care, as well as pain medications.  (*Id.*)  He stated that Plaintiff "has not had any diagnostic testing performed because workers compensation would not authorize this testing and she does not have medical insurance."  (*Id.*)  His opinion as to her RFC remained unchanged from his November 16, 2000 evaluation.  (*Id.*)

### 4.  Medical Expert's Testimony

Louis Lombardi, M.D., reviewed Plaintiff's medical records and testified at the July 28, 2009 hearing before the ALJ.  (R. 1767-73.)  Dr. Lombardi opined that Plaintiff was not capable of any work, sedentary or otherwise, beginning on April 7, 1995, the date of her injury.  (R. 1767-68.)  He opined that she became capable of sedentary work after May 31, 1997, which was one year after her arthroscopic surgery.  (R. 1768.)  He explained that any swelling or atrophy of the right knee noted by examining doctors prior to December 31, 2001 would not have affected her ability to perform sedentary work after May 31, 1997.  (R. 1770-73.)

### C.  Testimony from Vocational Expert

Andrew Pasternak, a vocation expert ("VE"), attended Plaintiff's July 28, 2009 hearing. (R. 1773-78.)  He testified that Plaintiff's past work as a data entry clerk and a radio dispatcher involved sedentary, semi-skilled work.  (R. 1774-75.)  Plaintiff had gained transferrable skills from those positions, including clerical skills, data entry, and computer skills.  (R. 1775.)  When presented with a hypothetical claimant of Plaintiff's age, education, and vocational experience, with an RFC for sedentary work, the VE testified that such an individual could perform Plaintiff's past work as a data entry clerk and a radio dispatcher.  (R. 1774-76.)

## DISCUSSION

### A.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow."  42 U.S.C. § 405(g).  A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision.  *See Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998).  The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal quotations omitted).  The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 82 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

**B.      Disability Claims**

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983). ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If at any step, the ALJ finds that the

claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[3] *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") in steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F. 2d at 642).

Under certain circumstances, a finding that the claimant is disabled for a finite period of time is appropriate. The Commissioner has promulgated regulations to assist ALJs in determining whether a claimant's alleged disability continues or ends. *See* 20 C.F.R. § 404.1594(f).

> First, the Commissioner determines whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1594(f)(1). If so, the Commissioner will find that the disability ended. *Id.* If not, the Commissioner's review proceeds.

---

[3]     20 C.F.R. pt. 404, subpt. P, app. 1.

Second, the Commissioner determines whether the claimant's impairment or combination of impairments meets or equals the severity of an impairment listed in Appendix 1. 20 C.F.R. § 404.1594(f)(2). If so, the claimant's disability is said to continue. *Id.* If not, the Commissioner's review proceeds.

Third, the Commissioner determines whether there has been medical improvement. 20 C.F.R. § 404.1594(f)(3). If there is no decrease in medical severity, there is no medical improvement. Upon finding medical improvement, measured by a decrease in medical severity, the Commissioner's review continues.

Fourth, the Commissioner determines whether the medical improvement found in step three is related to the claimant's ability to do work in accordance with 20 C.F.R. § 404.1594(b)(1)-(4). Medical improvement is related to the ability to work if it results in an increase in the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1594(b)(3). If medical improvement is unrelated to the claimant's ability to work, the Commissioner proceeds to step five. *Id.* If the medical improvement is related to the claimant's ability to work the Commissioner proceeds to step six. *Id.*

Fifth, the Commissioner considers whether the exceptions to medical improvement listed in 20 C.F.R. § 404.1594(d) and (e) apply to the claimant's medical improvement. 20 C.F.R. § 404.1594(f)(5). If none apply, the claimant's disability continues. *Id.*

Sixth, if medical improvement is related to the claimant's ability to do work or one of the aforementioned exceptions applies, the Commissioner will determine whether the claimant's impairments are severe. 20 C.F.R. § 404.1594(f)(6). When the evidence shows that all current impairments do not significantly limit the claimant's physical or mental abilities to perform basic work activities, the impairments are not severe and the claimant will no longer be considered disabled. *Id.*

Seventh, if the claimant's impairments are severe, the Commissioner will assess the claimant's residual functional capacity based upon all current impairments and determine whether claimant is able to perform past work. 20 C.F.R. § 404.1594(f)(7). If capable of doing past work, the claimant is no longer disabled. *Id.*

> Finally, if the claimant can no longer perform past work, the
> Commissioner must determine whether the claimant is capable of
> other work given her residual functional capacity assessment and
> her age, education, and previous work experience. 20 C.F.R. §
> 404.1594(f)(8). If the claimant is capable, her disability will have
> ended. *Id.* If the claimant is incapable, her disability is found to
> continue. *Id.*

*Barra v. Astrue*, 2012 WL 925005, at *9-10 (E.D.N.Y. Mar. 19, 2012) (quoting *Wilson v. Astrue*, 2010 WL 2854447, at *2-3 (W.D.N.Y. July 19, 2010)). "Further, in a medical improvement case in which a claimant has been granted [DIB] for a closed period, the Commissioner must compare the severity of claimant's impairment at the onset of disability with the severity of claimant's impairment at the purported end-date of disability, i.e., the point at which the claimant medically improved and could return to work." *Crowell v. Astrue*, 2011 WL 4863537, at *2 (S.D.N.Y. Oct. 12, 2011) (citing *Chavis v. Astrue*, 2010 WL 624039, at *4 (N.D.N.Y. Feb. 18, 2010)).

## C. ALJ's Decision

On August 24, 2009, the ALJ issued a partially favorable decision. (R. 303-19.) At the first step, the ALJ found that plaintiff had not worked since her alleged onset date, April 7, 1995. (R. 310.) At the second step, the ALJ concluded that plaintiff suffered from the following severe impairments: cervical and lumbar radiculopathy, and a left knee internal derangement. (*Id.*) At the third step, the ALJ concluded that these impairments in combination or individually did not meet or equal a listed impairment. (R. 314-15.) At the fourth step, the ALJ concluded that Plaintiff was disabled from April 7, 1995 through May 31, 1997 as she could not perform even sedentary work during that period. (R. 315.) This portion of the ALJ's decision is not in dispute.

The ALJ further concluded that a medical improvement occurred as of June 1, 1997 and that Plaintiff was no longer disabled as the medical improvement related to her ability to work. (*Id.*) The ALJ found that Plaintiff retained the RFC to perform sedentary work. (R. 315-18.) Based on the Plaintiff's age, education, work experience, RFC, and acquired transferable skills,

the ALJ concluded that Plaintiff could work as a data entry clerk or a radio dispatcher, both of which are positions she has previously held. (R. 318.) It is the ALJ's findings with respect to Plaintiff's medical improvement and RFC after May 31, 1997 that are at issue in the instant action.

**D.      Analysis**

**1.      ALJ's Decision Applied Correct Legal Principles and Is Supported by Substantial Evidence**

In reaching the conclusion that Plaintiff's disability was temporary, the ALJ did not delineate each of his findings of the Commissioner's eight-step process; however, the Court finds that the ALJ addressed each step in his decision. The first and second steps are satisfied by the ALJ's findings with respect to the closed disability period. (R. 310-15.) At the third step, the ALJ reviewed the medical evidence in Plaintiff's file, concluding that she experienced a medical improvement. (R. 315.) In particular, he stated that:

> Physical examination results, including the reports of Dr. Seo, demonstrate that claimant's surgically repaired knee was stable. She had some loss of spinal motion, but with mild spasms. Joint range of motion was unremarkable. No loss of sensation, motor power or reflexes is established. The results of diagnostic testing such as MRI produced negative results.

(*Id.*) At the fourth step, the ALJ concluded that Plaintiff's medical improvement was related to her ability to work. (*Id.*) At the sixth step, he found that, as of June 1, 1997, Plaintiff had the ability to perform sedentary work. (R. 315-16.) Finally, at the seventh step, the ALJ found that Plaintiff was able to perform her past relevant work as a data entry clerk or as a radio dispatcher as those positions required only sedentary levels of physical exertion. (R. 318.) The substantial evidence in the records supported these findings.

Generally, the evidence from Plaintiff's physicians does not support a finding of total disability. In May 2007, Dr. Goldberg opined that Plaintiff had a permanent partial disability in her right knee. (R. 129.) In June 1997, Dr. Toeldano opined that Plaintiff was disabled "for her usual and customary employment as a motor vehicle operator." (R. 128) Notably, this finding is limited to the position Plaintiff held at the time of her injury, which is classified as a position requiring a medium level of physical exertion. (R. 1774.) Neither he nor Dr. Goldberg assessed whether Plaintiff could perform sedentary work, such as data entry or radio dispatching. The x-rays taken of her right knee during this period were negative. (R. 128-34.) Thus, it is not surprising that Plaintiff was able to serve as a juror for five days in August 1997. (R. 47-49.) In March 1998 and February 1999, Dr. Schwartz set forth a series of work restrictions that were consistent with sedentary work. (R. 149-55, 169-74.) The MRI of Plaintiff's lumbar spine, taken on July 31, 1998, was negative. (R. 1447.) This evidence demonstrates a decrease in the severity of Plaintiff's impairments, as well as the ability to perform sedentary work.

On June 16, 1999, Dr. Schwartz opined that Plaintiff's work abilities were more restrictive, and that she would be absent three times per month due to her conditions. (R. 176-81.) He stated that these restrictions dated back to April 7, 1995 (R. 181), even though his earlier examinations and reports from January 1998 through February 1999 indicated otherwise. On August 9, 2000, Plaintiff began treating with an internist, Dr. James. He provided a similarly restrictive assessment of her work abilities and, like Dr. Schwartz, indicated that these limitations began on April 7, 1995. (R. 264.) Neither of these physicians stated that Plaintiff was totally disabled. Plaintiff continued to treat regularly with physical therapy and chiropractic care. (R. 475-95, 1023-40.) In July 2001, Dr. James evaluated Plaintiff and indicated that she was only "moderately" disabled. (R. 250.)

The state medical experts who conducted examinations and reviews of Plaintiff's medical records all support the ALJ's conclusion that Plaintiff was capable of sedentary work. On December 1997, Dr. Seo conducted an orthopedic consultative examination, finding no muscle atrophy, and normal range of motion with respect to her cervical spine, upper extremities, ankles, and left knee. (R. 138-39.) He did not specifically state whether she was capable of performing sedentary work, but he did opine as to work limitations consistent with sedentary work. (R. 139.) On December 15, 1997, Dr. Kaye reviewed her medical records and opined that Plaintiff retained the RFC to perform sedentary work. (R. 141-48.) At Plaintiff's second consultative examination with Dr. Seo on November 17, 1998, Dr. Seo reiterated his earlier findings with respect to her ability to work. (R. 156-59.) He explained that she did not need a cane to walk because there was no instability in her knees. (R. 158.) On December 14, 1998, Dr. Ladopoulous, another state medical consultant, examined Plaintiff and opined that she could perform sedentary work. (R. 160-67.) He, too, concluded that she did not need a cane to walk because there was no instability in her knees. (R. 165.) Dr. Lombardi, a state medical consultant, reviewed Plaintiff's medical records and testified at the July 28, 2009 hearing. (R. 1767-73.) He opined that Plaintiff was able to perform sedentary work on June 1, 1997. (R. 1770-73.)

It was not improper for the ALJ to rely upon the opinion of a state medical examiner in determining whether Plaintiff experienced medical improvement and in assessing her RFC. ALJs are entitled to rely on the opinions of state agency medical consultants, who are highly qualified physicians and experts in the evaluation of medical issues arising in disability cases. *See* 20 C.F.R. § 404.1527(e). Moreover, Dr. Lombardi's opinion was consistent with the contemporaneous opinions of Dr. Schwartz, Plaintiff's physician (R. 169-74), as well as those of

the other state medical examiners (R. 138-39, 141-48, 150-59, 160-67). The opinions of the state medical examiners are consistent with their examinations of Plaintiff and with the diagnostic evidence available, as all x-rays and MRIs were negative. (R. 128-34, 1447.) Indeed, at the time of Plaintiff's surgery, Dr. Goldberg noted that "[t]he medial meniscus was noted to have a torn, or irregular free edge but quite insignificant and not enough to pay attention to with the use of basket forceps. There was no detachment of the meniscus. There was no tear that was significant." (R. 137.)

## 2. The ALJ's Analysis of the Opinions of Treating Physicians

Contrary to Plaintiff's assertion, the ALJ did not err in declining to give controlling weight to the assessments of Plaintiff's physicians. A treating source's medical opinion regarding the nature and severity of an impairment is given controlling weight when supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F. 3d 563, 567 (2d Cir. 1993) (*citing* 20 C.F.R. § 404.1527(d)). When a treating source's opinion is not given controlling weight, the proper weight accorded depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Soc. Sec.*, 143 F. 3d 115, 118 (2d Cir. 1998) (citing 20 C.F.R. § 404.1527(d)). Additionally, the ALJ must always "give good reasons" in her decision for the weight accorded to a treating source's medical opinion. *Id*. Moreover, there are certain decisions reserved to the Commissioner, such as the determination that a claimant is "disabled" or "unable to work." 20 C.F.R. § 404.1527(d)(1). "That means that the Social Security Administration considers the data that physicians provide but draws its own

conclusions as to whether those data indicate disability. A treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F. 3d 128, 133 (2d Cir. 1999).

The ALJ explained that he did not give controlling weight to the opinions of Plaintiff's physicians because they were not supported by the evidence and they were inconsistent with the evidence in Plaintiff's records. (R. 317-18.) In particular, he stated that:

> [T]hese opinions are not consistent with reported findings on physical examinations. The results of these examinations, as reported by all three of claimant's physicians, included pain, tenderness and some reduction in range of motion. However, demonstrated loss of range motion in the spine, shoulders, and knees, was only moderate. Ms. Esmede's report contains no objective medical information whatsoever. None of the reports of claimant's treating medical sources provide any evidence of any neurological abnormalities. Claimant's sensation has remained intact throughout after the closed period as found herein. The record contains no demonstrated reflex abnormalities or loss of motor power. Coordination has been intact. Claimant has been consistently described as 'ambulatory,' though with the use of an assistive device. No MRI, EMG, nerve conduction velocity study, or CT scan has been performed to evaluate complaints of neck or back pain, or extremity numbness. The diagnosis of radiculopathy is therefore speculative and unconfirmed. Dr. Schwartz and Dr. James have also been inconsistent in their opinions. At different points in the record, Dr. Schwartz opined that claimant had only an 18% "whole body deficit," and in 1996 opined that claimant could sit without limitation, and stand or walk for 6 hours in a day. It was only later that he changed his opinion, even though the objective medical findings remained essentially unchanged. Dr. James opined that claimant's functional capacity is for less than the full range of sedentary work. However, his treatment record contain[s] only minimal examination and clinical findings, and he repeatedly stated in these records that claimant was only 'moderately' or 'partially' disabled. These opinions are contradicted by the reports of Dr. Seo, the state agency medical consultant, whose reported findings are not consistent with the presence of a disabling orthopedic impairment[.] Also, Dr. Rajogopal, a treating medical source, stated specifically that claimant was 'ambulatory with the use of a cane,' which hardly demonstrates that claimant is currently incapable of sustained work

activity at a sedentary level of exertion. For these reasons, the treating source opinions in this matter are not given controlling, or even great, weight.

(R. 317-18.)

The ALJ appropriately summarized Plaintiff's medical evidence, and set forth the reasons for declining to give the opinions of Plaintiff's treating physicians "controlling, or even great, weight." It was not improper, as Plaintiff suggests, for the ALJ to discuss the physicians collectively in one section. It is clear from the ALJ's discussion of the physicians that he had different issues with respect to the different physicians regarding consistency and clinical findings. Thus, the ALJ properly applied the treating physician rule in discounting the opinions of Plaintiff's treating physicians.

Plaintiff contends that the ALJ improperly discounted the opinion of her physical therapist, Ms. Esmade. (Pl. Mem. at 28-29.) Physical therapists are not acceptable medical sources and cannot render medical opinions. 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2); *see also* Social Security Regulation ("SSR") 06-3p. Nonetheless, the ALJ considered her opinion as to Plaintiff's disability status. (R. 312.) The ALJ declined to give her opinion "controlling, or even great, weight," on the ground that it "contains no objective medical information whatsoever." (R. 317.) The bulk of the hundreds of pages of reports from Ms. Esmade contains notes as to Plaintiff's reported pain and symptoms, and not clinical medical findings. Thus, contrary to Plaintiff's assertion, the ALJ explained the reason for discounting the reports from Plaintiff's physical therapist and that reason is justified based on a review of the record.

Plaintiff contends that the case must be remanded because the ALJ failed to address why he discounted the opinions of Drs. Toledano and Goldberg, and what weight, if any, he assigned to their opinions. (Pl. Mem. at 23.) The ALJ did not discuss medical evidence from these

physicians in his application of the treating physician rule. (R. 317-18.) However, that omission is not fatal. Neither of those physicians evaluated Plaintiff for sedentary work. Further, with respect to Plaintiff's right knee, Dr. Goldberg's notes can only be interpreted as indicating that the surgery was likely unnecessary. He found no evidence of a meniscal tear and nothing "significant" otherwise. (R. 137.) In August 1996, he described her as "recuperating nicely," "making progress," and walking without a limp. (R. 195-96.)

Finally, although it is not explicit in the ALJ's decision, it is clear that the ALJ gave great weight to the opinions of Drs. Seo and Lombardi. It was not improper to give such weight to the opinion of a medical expert who has reviewed all of the medical evidence and issued an opinion consistent with the substantial evidence. *See Diaz v. Shalala*, 59 F. 3d 307, 313 n.5 (2d Cir. 1995) (explaining that the regulations allow, among other things, "the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record"); *Oliphant v. Astrue*, 2012 WL 3541820, at *15 (E.D.N.Y. Aug. 14, 2012) ("[Under the Regulations, opinions of non-treating and non-examining doctors can override those of treating doctors as long as they are supported by evidence in the record.") (citing *Schisler v. Sullivan*, 3 F. 3d 563, 568 (2d Cir. 1993)).

### 3. The ALJ's Analysis of Plaintiff's RFC

Plaintiff contends that the ALJ failed to perform the "function-by-function" assessment of her abilities required by SSR 96-8p before deciding that she could do sedentary work and, thus, did not satisfy the Commissioner's burden at step five of the sequential analysis. (Pl. Mem. at 32-34.) This assertion lacks merit. The ALJ found that "claimant could sit, stand and/or walk for up to 6 hours in an 8-hour day, and she could lift or carry up to 10 pounds occasionally." (R. 315.) The ALJ further explained that: "There is no evidence of any functional restrictions

secondary to any non-exertional impairment. Claimant has no established limitations in the areas of daily living, social functioning, memory, sustained attention and concentration, or adaptation." (R. 316.) In addition to these explicit findings as to her physical and mental restrictions, the ALJ relied upon the VE, who testified and confirmed that someone with Plaintiff's specific attributes could perform sedentary work such as data entry or radio dispatching. (R. 1774-76.) The ALJ's function-by-function assessment was adequate. *See Oliphant*, 2012 WL 3541820, at *23 (concluding that the Commissioner sustained his burden at step five, as the ALJ, in determining that plaintiff could perform sedentary work, made findings as to plaintiff's ability to sit, stand, walk, lift, carry, push, and pull, in addition to findings regarding plaintiff's mental and physical ability to perform sedentary work); *see also Murphy v. Astrue*, 2013 WL 1452054, at *6 (W.D.N.Y. Apr. 9, 2013) (finding that "although the ALJ did not methodically walk through each 'function,' the ALJ adequately considered how the evidence supported her conclusion concerning Plaintiff's physical limitations and her ability to perform sedentary work" as the ALJ detailed medical evidence from treating sources, opinions from state-medical examiners, as well as Plaintiff's ability to live independently). Accordingly, in reaching the conclusion that Plaintiff could perform sedentary work, the ALJ adhered to the proper legal principles and relied on the substantial evidence in the record.

### 4.    The ALJ's Analysis of Plaintiff's Credibility

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *See Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2003). However, the ALJ is afforded discretion to assess the credibility of a claimant and is not "required to credit [Plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v.*

*Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008)).  In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations.  *See Peck v. Astrue*, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010).  First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged.  20 C.F.R. § 404.1529(b); S.S.R. 96-7p.  Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work.  20 C.F.R. § 404.1529(c).  When the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors:  1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, [she] must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief."  *Correale-Englehart*, 687 F. Supp. 2d at 435.  When the ALJ neglects to discuss at length her credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether her decision is supported by substantial evidence, remand is appropriate.  *Id.* at 435-36; *see also Grosse v.*

*Comm'r of Soc. Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding because the ALJ failed to address all seven factors).

Turning to the instant action, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the period after the closed period found herein." (R. 317.) The ALJ then proceeded to the requisite seven-step credibility analysis and addressed each of the factors.

He found that Plaintiff "engages currently in a reasonable range of daily living activities," is "independent in self care," and "maintains her residence." (*Id*.) Plaintiff contends that this finding is contrary to the evidence in her file, namely, her testimony at prior hearings. (Pl. Opp'n at 35-36.) In July 2000, Plaintiff testified that she relied on others to do her cooking, cleaning (including making her bed), and shopping. (R. 30.) The record indicates that Plaintiff lives alone, in a single-family home, and that she was able to take care of her personal needs, as well as cooking two or three times per week, "a little" cleaning, and shopping and light chores once a month. (R. 30, 100, 118.) She read and watched television, and was able to travel to physical therapy and chiropractic treatments several times per week, either by taxi or a friend's car. (R. 30, 393, 395.) Plaintiff belonged to a health club. (R. 1033.) Notably, Plaintiff served on a jury for five days in August 1997. (R. 47-49.) The ALJ's determination that Plaintiff's daily activities cuts against her credibility with respect to symptoms is supported by the substantial evidence in the record.

The ALJ found that Plaintiff's allegations of symptoms were "disproportionate" and "not supported by the medical record, in particular findings on physical examination and the results of diagnostic testing." (R. 317.) This finding is supported by the substantial evidence. All of Plaintiff's x-rays and MRIs were negative. (R. 128, 130, 136, 199, 1447.) Dr. Goldberg, who performed her surgery, found nothing "significant" with respect to the injury to her right knee. (R. 137.) Plaintiff did not suffer from muscle atrophy and maintained significant range of motion of her extremities and spine. (R. 138-39, 154.) During examinations she was able to get on and off of the examination table without difficulty and to change from a seated to standing position without difficulty. (R. 156.) The ALJ noted, and the record indicates, that Plaintiff has not required hospitalization or surgery since 1996. (R. 317.) Furthermore, Plaintiff took aspirin regularly, rather than prescribed pain medications, which suggests that she did not suffer from debilitating pain. (R. 115, 122-23, 126-27.)

Plaintiff argues that the ALJ improperly bolstered his decision by penalizing her for engaging in conservative, non-surgical treatment, because the Workers' Compensation Board would not authorize any further orthopedic treatment and she could not afford to pay for it on her own. (Pl. Mem. at 36-37.) Plaintiff's conservative treatment after January 2000 was just one of many factors that the ALJ relied upon in evaluating her credibility as to symptoms. (R. 317.) The totality of the medical evidence supports the ALJ's conclusion as to Plaintiff's credibility regarding symptoms.

### 5.  The ALJ's Analysis of Plaintiff's Past Relevant Work

Plaintiff contends that the ALJ failed to develop the record with respect to the precise requirements of her past relevant work and that this omission means that the ALJ's finding that Plaintiff can perform her past relevant work is not supported by the substantial evidence. (Pl.

Mem. 37-39.)  A claimant retains the ability to perform her past relevant work if she retains the RFC to perform the functional demands and job duties of such work as it is generally performed throughout the national economy.  *See* SSR 82-61; *Jasinski v. Barnhart*, 341 F. 3d 182, 185 (2d Cir. 2003) (affirming summary judgment in the Commissioner's favor and explaining, in the context of a claim for Supplemental Security Income, that "the claimant has the burden to show an inability to return to her previous specific job *and* an inability to perform her past relevant work generally") (emphasis in original).  Furthermore, "[a] vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy."  20 C.F.R. § 404.1560(b)(2).

The substantial evidence supports the ALJ's determination that Plaintiff could return to her past relevant work as a data entry clerk or radio dispatcher.  Plaintiff's own description of the functional abilities required of data entry clerks and radio dispatchers is consistent with sedentary levels of exertion.  Plaintiff submitted reports indicating that, in an eight-hour work day, her position as a data entry clerk involved walking two hours, standing one hour, sitting six hours, occasionally bending, and lifting up to ten or twenty-five pounds.  (R. 112, 120.)  In an eight-hour work day, her position as a radio dispatcher involved walking two hours, standing one hour, sitting six hours, occasional bending, and lifting up to ten pounds.  (R. 110.)  Furthermore, the VE testified that Plaintiff had the ability to perform her past relevant work as a data entry clerk or radio dispatcher because those positions involve sedentary levels of exertion.  (R. 1774-76.)

**CONCLUSION**

For the reasons set forth above, the Commissioner's motion is granted. Plaintiff's cross-motion is denied and the instant action is dismissed with prejudice.

SO ORDERED

DATED:     Brooklyn, New York
                September 30, 2013

_____/s/_____
DORA L. IRIZARRY
United States District Judge